UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) ) ) | |
| Plaintiff(s), ) ) | |
| vs. ) ) | Case No. 4:07CV270 JCH |
| MICHAEL F. SHANAHAN, SR. and MICHAEL F. SHANAHAN, JR., et al., ) ) ) ) | |
| Defendant(s). ) | |

# MEMORANDUM AND ORDER

This matter is before the Court on Defendant Michael F. Shanahan, Jr.'s Motion to Dismiss, filed September 2, 2008. (Doc. No. 39). The matter is fully briefed and ready for disposition.

## BACKGROUND[1]

Engineered Support Systems, Inc. ("Engineered Support" or the "Company") is a Missouri corporation, with its principal place of business in St. Louis, Missouri. (Complaint ("Compl."), Cause No. 4:07CV1262 ERW[2], Doc. No. 1, ¶ 14). Engineered Support is a holding company for a number of wholly-owned subsidiaries that design and manufacture military support equipment and electronics, primarily for the U.S. Department of Defense. (Id.). Engineered Support's common stock was traded on the NASDAQ NMS, and was registered with the United States Securities and Exchange Commission (the "Commission" or "SEC") pursuant to Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act"), until it was acquired by DRS Technologies, Inc. on January 31, 2006.

---

[1] The majority of the Court's background section is taken from the Securities and Exchange Commission's Complaint, to which Defendant Michael F. Shanahan, Jr. has not yet filed an answer.

[2] On October 24, 2007, this Court consolidated Cause No. 4:07CV1262 ERW with this action. (Doc. No. 32).

(Id.). Defendant Michael F. Shanahan, Jr. ("Shanahan Jr.") served on Engineered Support's Board of Directors from 1994 through January 31, 2006, and served on the Compensation Committee of the Board of Directors from 1995 through 2002. (Id., ¶ 13).

According to the SEC, between at least 1985 and January, 2006, Engineered Support issued stock options to employees and non-employee directors pursuant to shareholder-approved stock option plans. (Compl., ¶ 15). From 1997 through 2002, the Company had two types of stock option plans in effect: one for officers, key employees and consultants ("Stock Option Plan"), and another for non-employee directors ("Non-employee Director Plan").[3] (Id.). Copies of these plans were included in the Company's proxy statements filed with the Commission, and the plans were approved by the Company's shareholders at annual shareholder meetings. (Id.).

The Stock Option Plan set a total amount of options to be allocated among officers, key employees, and consultants, and charged the Engineered Support Compensation Committee with administration of the plan. (Compl., ¶ 16). The Compensation Committee had the exclusive power to grant options under the plan, subject to approval by the Chairman of the Board, Defendant Michael F. Shanahan, Sr. ("Shanahan"). (Id.). According to the Commission, Shanahan Jr. assumed a leading role in making recommendations regarding executive compensation, including the award of options to Company employees under the Stock Option Plan. (Id., ¶ 19).

All options granted under the Stock Option Plan vested immediately. (Compl., ¶ 18). The Company explicitly stated the options were to be granted with an exercise price equal to the closing market price of Engineered Support's common stock on the date the options were granted. (Id.). The Commission refers to such option grants as "at-the-money," and recipients of such options would

---

[3] With respect to Shanahan Jr.'s involvement with the Non-employee Director Plan, the Commission alleges only that he received profits of $379,738 from his receipt of unauthorized options. (Compl., ¶ 8).

profit only if the Company's stock price rose after the options were awarded. (Id., ¶ 2). According to the SEC, however, on a number of occasions between 1997 and 2002, with the Shanahans' participation, knowledge, and consent, Engineered Support repeatedly issued backdated stock options that contained a lower exercise price than the price of the Company's common stock on the date the options were awarded. (Id., ¶ 21).[4] Because Engineered Support's options vested immediately, the backdating of option grants allowed the Shanahans and other option recipients to realize an immediate profit that had not been authorized by Company shareholders. (Id., ¶¶ 4, 22). The Commission alleges the backdating of stock options improperly increased the compensation paid to Engineered Support's officers, employees, and directors by approximately $20 million dollars. (Id., ¶ 7). The SEC further contends Shanahan and Shanahan Jr. knew, or were reckless in not knowing, that the awarding of such "in-the-money" options was not permitted by Engineered Support's stock option plans. (Id., ¶ 24).

As to Shanahan Jr. personally, the SEC alleges as follows:

26. Shanahan Jr. also assisted in the Company's concealment of its backdating and caused the Company to fail to keep proper records reflecting its option grants. As a member of the Compensation Committee, Shanahan Jr. failed to ensure that the Compensation Committee kept records reflecting the dates on which the committee authorized the Company's option grants....

28. On July 12, 2000, Shanahan Jr. received a list of potential option recipients containing a date, "4-May-00," and a price, "10 13/16," which was the closing price of the stock on that date. On July 17, Shanahan Jr. transmitted changes to this list to the Company's CFO. Engineered Support subsequently issued options with a May 4, 2000 grant date and a 10 13/16 exercise price, which was the lowest possible exercise price for that quarter. When the option grant was finalized in late July, Shanahan Jr. signed the option award letter for his father, which contained a false date of May 5, 2000....

---

[4] The SEC maintains the backdated option grants included those with purported grant dates of December 2, 1996; February 1, March 10, and September 4, 1998; July 1, and December 9, 1999; May 4, 2000; March 29, 2001; and July 24, and October 17, 2002. (Compl., ¶ 21).

30. On July 16, 2002, Shanahan Jr. sent an email to Engineered Support's CFO and instructed him to issue options at a previously agreed upon price. Shanahan Jr. provided the number of options for four top executives and instructed the CFO to issue those options that day, writing, "we can issue the others when the final list is completed." The options were to be issued with a June 14, 2002 grant date, which was the low point in Engineered Support's stock price so far that quarter. However, the Company's stock price hit a new low on July 24. The next day, Shanahan Jr. contacted Engineered Support's Controller and CFO to suggest using July 24 date as the option grant date. As late as August 8, Shanahan Jr. and the Company's CFO were modifying the number of options each recipient was to receive by adding new recipients and reducing the number of options the top executives were to receive as of July 16. The final option certificates were created on August 9 with a July 24, 2002 grant date and exercise price.

(Compl., ¶¶ 26, 28, 30).

As further evidence of wrongdoing, the SEC alleges that between 1997 and 2003, the Shanahans caused Engineered Support to file official documents with the Commission that they knew, or were reckless in not knowing, contained materially false and misleading statements and omissions of material facts relating to the Company's stock option program. (Compl., ¶ 37). Specifically, the SEC maintains the Shanahans approved proxy statements containing Compensation Committee Reports falsely stating all options had been granted at an exercise price equal to the fair market value of the stock on the date of the award. (Id., ¶ 38).[5] By failing to disclose the awards of in-the-money stock options, Engineered Support concealed material amounts of compensation paid to its top executives. (Id., ¶ 39).[6] The SEC further alleges Shanahan and Shanahan Jr. approved and signed Engineered Support's Form 10-K annual reports filed with the Commission, its Form S-8 registration

---

[5] The SEC alleges the proxy statements were filed with the Commission, distributed to shareholders, and incorporated by reference in the Company's registration statements filed with the Commission. (Compl., ¶ 38).

[6] The Commission maintains levels of executive compensation and stock option grants were material to Engineered Support's shareholders' investment and proxy voting decisions. (Compl., ¶ 42).

statements, and its Forms 4 and 5, knowing, or being reckless in not knowing, that those forms contained materially false and misleading statements and omissions of material fact concerning Engineered Support's stock option program. (Id., ¶ 43, 45-46).

The SEC filed its Complaint against Shanahan and Shanahan Jr. on July 12, 2007. Based on the foregoing allegations, the Commission asserts the following claims for relief against Shanahan Jr.: Violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a) (Count I); Violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5 (Count II); Violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Exchange Act Rule 14a-9, 17 C.F.R. § 240.14a-9 (Count III); Aiding and Abetting Engineered Support's Violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Exchange Act Rules 12b-20 and 13a-1, 17 C.F.R. §§ 240.12b-20, 240.13a-1 (Count VI); and Aiding and Abetting Engineered Support's Violations of Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A) (Count VII). (Compl., ¶¶ 52-60, 67-74).

As stated above, Shanahan Jr. filed the instant Motion to Dismiss on September 2, 2008, requesting that Counts I, II, VI and VII of the Commission's Complaint against him be dismissed for failure to state a claim. (Doc. No. 39). Specifically, Shanahan Jr. asserts the Complaint fails to allege fraud with particularity under Fed.R.Civ.P. 9(b), fails to allege the requisite element of scienter, and fails to allege the provision of substantial assistance and requisite state of mind for claims of aiding and abetting liability.

## **MOTION TO DISMISS STANDARD**

In ruling on a motion to dismiss, the Court must view the allegations in the Complaint in the light most favorable to Plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Additionally, the Court, "must accept the allegations contained in the complaint as true and draw all reasonable

inferences in favor of the nonmoving party."[7] Coons v. Mineta, 410 F.3d 1036, 1039 (8th Cir. 2005) (citation omitted). A motion to dismiss must be granted if the Complaint does not contain, "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007) (abrogating the "no set of facts" standard for Fed.R.Civ.P. 12(b)(6) found in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Stated differently, to survive a motion to dismiss, the Complaint's factual allegations, "must be enough to raise a right to relief above the speculative level." Id. at 1965 (citations omitted).

A heightened pleading standard applies to claims of fraud, as follows: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be averred generally." Fed.R.Civ.P. 9(b). "Simply stated, a complaint must set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." SEC. v. Thielbar, 2007 WL 2903948 at *4 (D.S.D. Sep. 28, 2007) (internal quotations and citations omitted). "In the context of securities litigation, the requirement of Fed.R.Civ.P. 9(b) that 'the circumstances constituting fraud...be stated with particularity' serves three purposes: (1) it deters the use of complaints as a pretext for fishing expeditions of unknown wrongs designed to compel *in terrorem* settlements; (2) it protects against damage to professional reputations resulting from allegations of moral turpitude; and (3) it ensures that a defendant is given sufficient notice of the

---

[7] "At the outset, the court notes that this is an SEC enforcement proceeding, not a private securities action and thus it is not subject to the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u." SEC. v. Guenthner, 212 F.R.D. 531, 532 n. 1 (D. Neb. 2003) (citation omitted); see also SEC. v. Kornman, 391 F.Supp.2d 477, 494 (N.D. Tex. 2005). Accordingly, the SEC need not create a strong inference of scienter, but rather may allege scienter generally. See SEC. v. Berry, 2008 WL 2002537 at *10 (N.D. Cal. May 7, 2008) ("Obviously, the SEC will have to eventually prove that [defendant] acted with scienter, but the SEC does not have to allege it with particularity.").

allegations against him to permit the preparation of an effective defense." SEC v. Guenthner, 212 F.R.D. at 533 (citation omitted).

## **DISCUSSION**

I. **Counts I and II**

As stated above, in Counts I and II the SEC claims Shanahan Jr. violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5. (Compl., ¶ 52-57). In his Motion to Dismiss, Shanahan Jr. asserts Counts I and II of the SEC's Complaint must be dismissed for failure to allege fraud with particularity. (Memorandum in Support of Defendant Michael F. Shanahan, Jr.'s Motion to Dismiss, PP. 7-14). Specifically, Shanahan Jr. asserts the Commission fails to identify his role, if any, in the alleged fraud, and fails sufficiently to specify that he acted with scienter. (Id.).

Section 17(a) of the Securities Act provides as follows:

> It shall be unlawful for any person in the offer or sale of any securities...by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> (1)　to employ any device, scheme, or artifice to defraud, or
>
> (2)　to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3)　to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. §77q(a). Section 10(b) of the Exchange Act prohibits the use of any "manipulative or deceptive device or contrivance" in connection with the purchase or sale of a security. 15 U.S.C. §78j(b). Rule 10b-5, promulgated by the SEC under Section 10(b), provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5.

"To successfully state a securities fraud claim under Rule 10b-5, a plaintiff must show the following: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the plaintiff's injury." SEC v. Thielbar, 2007 WL 2903948 at *5 (internal quotations and citation omitted). "While scienter is not explicitly mentioned in the statutory text, it is an essential element of a § 10b-5 or Rule 10b-5 claim." Id. (citation omitted).[8] Scienter is defined as the intent to deceive, manipulate, or defraud, and allegations of recklessness may satisfy the standard. See Kushner v. Beverly Enterprises, Inc., 317 F.3d 820, 827 (8th Cir. 2003); SEC v. Guenthner, 212 F.R.D. at 533. Recklessness in turn is defined as, "those highly unreasonable omissions or representations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so

---

[8] "The elements of a securities fraud claim under Section 10(b) of the Exchange Act, Rule 10b-5 and Section 17(a)(1) of the Securities Act are essentially the same." SEC v. Thielbar, 2007 WL 2903948 at *5. Thus, the SEC must establish scienter to prevail on its securities fraud claims under Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a) of the Securities Act. Id.

obvious that the defendant must have been aware of it." SEC v. Guenthner, 212 F.R.D. at 533 (internal quotations and citations omitted).

Upon consideration, the Court finds the SEC's Complaint contains particularized allegations of fraud, sufficient to survive Shanahan Jr.'s Motion to Dismiss. First, the Complaint outlines a scheme intended to grant unauthorized and undisclosed compensation to Shanahan Jr. and other officers, directors, and employees of Engineered Support. The Complaint continues to allege actions on the part of Shanahan Jr. to further the scheme, including affirmative acts of backdating, and participation in the filing of reports with the Commission containing false or misleading representations and/or omissions with respect to the stock option grants. (Compl., ¶¶ 28, 30, 43, 45-46). The SEC's Complaint thus satisfies the purpose of Rule 9(b), "to afford defendant fair notice of plaintiff's claims and the factual ground upon which [they] are based..." SEC v. Thielbar, 2007 WL 2903948 at *4 (internal quotations and citations omitted).

With respect to scienter, as stated above the SEC contends Shanahan Jr. knew, or was reckless in not knowing, that the awarding of "in-the-money" options was not permitted under Engineered Support's stock option plans. (Compl., ¶ 24). The SEC further alleges Shanahan Jr. assisted in the Company's concealment of its backdating, by causing the Company to fail to keep proper records reflecting its option grants, and by signing and/or approving proxy statements containing materially false and misleading statements and omissions of material fact regarding the Company's stock option grants. (Id., ¶¶ 26, 38). Shanahan Jr.'s alleged attempts to conceal his activities raise the inference he knew the backdating was wrong, which in turn gives rise to, "an inference of at least recklessness, if not a greater level of culpability." SEC v. Guenthner, 212 F.R.D. at 534. The SEC's allegations of scienter thus are sufficient to withstand Shanahan Jr.'s Motion to Dismiss under Fed.R.Civ.P. Rules 12(b)(6) and 9(b).

## II. Counts VI And VII

In Counts VI and VII of its Complaint, the SEC charges Shanahan Jr. with aiding and abetting Engineered Support in filing false reports with the SEC, and in failing to maintain accurate books and records. (Compl., ¶¶ 67-74). "In alleging that defendant aided and abetted [Engineered Support] in filing materially misleading reports and failing to keep accurate records, the SEC must establish a securities laws violation by the primary party, which can be a corporation such as [Engineered Support]." SEC v. Cohen, 2007 WL 1192438 at *18 (E.D. Mo. Apr. 19, 2007) (citations omitted). "Assuming a primary violation, *arguendo*, aiding and abetting not only requires assistance, but also knowledge of a wrongful purpose." Id. at *19 (internal quotations and citation omitted).

Upon consideration, the Court finds the SEC successfully has asserted both Shanahan Jr.'s participation in the alleged wrongdoing, and his knowledge of its wrongful purpose. (See, e.g., Compl., ¶¶ 26, 37-38, 43, 45-46). Thus, because the allegations of the Complaint adequately fulfill the SEC's pleading requirements under Fed.R.Civ.P. 8(a), Shanahan Jr.'s Motion to Dismiss Counts VI and VII must be denied.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Michael F. Shanahan, Jr.'s Motion to Dismiss (Doc. No. 39) is **DENIED**.

Dated this 12th day of December, 2008.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE