UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff(s), | ) ) |
| vs. | ) ) Case No. 4:07CV270 JCH |
| MICHAEL F. SHANAHAN, JR., | ) ) ) |
| Defendant(s). | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiff's Motion to Limit the Opinion Testimony of Ernest L. Ten Eyck, filed October 7, 2009. (Doc. No. 100). The matter is fully briefed and ready for disposition.

**BACKGROUND**

Between 1994 and January 31, 2006, Defendant Michael F. Shanahan, Jr. ("Shanahan Jr.") served on the Board of Directors of Engineered Support Systems, Inc.[1] ("ESSI" or the "Company"). (Complaint ("Compl."), Cause No. 4:07CV1262 ERW[2], Doc. No. 1, ¶ 13). From 1995 through 2002, Shanahan Jr. served on ESSI's Compensation Committee. (Id.).

According to the SEC, between at least 1985 and January, 2006, ESSI issued stock options to employees and non-employee directors pursuant to shareholder-approved stock option plans.

---

[1] ESSI's common stock was traded on the NASDAQ NMS, and was registered with the United States Securities and Exchange Commission (the "Commission" or "SEC") pursuant to Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act"), until it was acquired by DRS Technologies, Inc. on January 31, 2006. (Compl., ¶ 14).

[2] On October 24, 2007, this Court consolidated Cause No. 4:07CV1262 ERW with this action. (Doc. No. 32).

(Compl., ¶ 15). From 1997 through 2002, the Company had two types of stock option plans in effect: one for officers, key employees and consultants ("Stock Option Plan"), and another for non-employee directors ("Non-employee Director Plan").[3] (Id.). Copies of these plans were included in the Company's proxy statements filed with the Commission, and the plans were approved by the Company's shareholders at annual shareholder meetings. (Id.).

The Stock Option Plan set a total amount of options to be allocated among officers, key employees, and consultants, and charged ESSI's Compensation Committee with administration of the plan. (Compl., ¶ 16). The Compensation Committee had the exclusive power to grant options under the plan, subject to approval by the Chairman of the Board, Michael F. Shanahan, Sr. (Id.). According to the Commission, Shanahan Jr. assumed a leading role in making recommendations regarding executive compensation, including the award of options to Company employees under the Stock Option Plan. (Id., ¶ 19).

All options granted under the Stock Option Plan vested immediately. (Compl., ¶ 18). The Company explicitly stated the options were to be granted with an exercise price equal to the closing market price of ESSI's common stock on the date the options were granted. (Id.). The Commission refers to such option grants as "at-the-money," and recipients of such options would profit only if the Company's stock price rose after the options were awarded. (Id., ¶ 2). According to the SEC, however, on a number of occasions between 1997 and 2002, with Shanahan Jr.'s participation, knowledge, and consent, ESSI issued backdated stock options that contained a lower exercise price

---

[3] With respect to Shanahan Jr.'s involvement with the Non-employee Director Plan, the Commission alleges only that he received profits of $379,738 from his receipt of unauthorized options. (Compl., ¶ 8).

than the price of the Company's common stock on the date the options were awarded. (Id., ¶ 21).[4]
Because ESSI's options vested immediately, the backdating of option grants allowed Shanahan Jr. and other option recipients to realize an immediate profit that had not been authorized by Company shareholders. (Id., ¶¶ 4, 22). The Commission alleges the backdating of stock options improperly increased the compensation paid to ESSI's officers, employees, and directors by approximately $20 million dollars. (Id., ¶ 7).

With respect to Shanahan Jr., the SEC alleges as follows:

26. Shanahan Jr. also assisted in the Company's concealment of its backdating and caused the Company to fail to keep proper records reflecting its option grants. As a member of the Compensation Committee, Shanahan Jr. failed to ensure that the Compensation Committee kept records reflecting the dates on which the committee authorized the Company's option grants....

28. On July 12, 2000, Shanahan Jr. received a list of potential option recipients containing a date, "4-May-00," and a price, "10 13/16," which was the closing price of the stock on that date. On July 17, Shanahan Jr. transmitted changes to this list to the Company's CFO. Engineered Support subsequently issued options with a May 4, 2000 grant date and a 10 13/16 exercise price, which was the lowest possible exercise price for that quarter. When the option grant was finalized in late July, Shanahan Jr. signed the option award letter for his father, which contained a false date of May 5, 2000....

30. On July 16, 2002, Shanahan Jr. sent an email to Engineered Support's CFO and instructed him to issue options at a previously agreed upon price. Shanahan Jr. provided the number of options for four top executives and instructed the CFO to issue those options that day, writing, "we can issue the others when the final list is completed." The options were to be issued with a June 14, 2002 grant date, which was the low point in Engineered Support's stock price so far that quarter. However, the Company's stock price hit a new low on July 24. The next day, Shanahan Jr. contacted Engineered Support's Controller and CFO to suggest using July 24 date as the option grant date. As late as August 8, Shanahan Jr. and the Company's CFO were modifying the number of options each recipient was to receive by adding new recipients and reducing the number of options the top executives were to

---

[4] The SEC maintains the backdated option grants included those with purported grant dates of December 2, 1996; February 1, March 10, and September 4, 1998; July 1, and December 9, 1999; May 4, 2000; March 29, 2001; and July 24, and October 17, 2002. (Compl., ¶ 21).

receive as of July 16. The final option certificates were created on August 9 with a July 24, 2002 grant date and exercise price.

(Compl., ¶¶ 26, 28, 30).

As further evidence of wrongdoing, the SEC alleges that between 1997 and 2003, Shanahan Jr. and others caused ESSI to file official documents with the Commission that they knew contained materially false and misleading statements and omissions of material facts relating to the Company's stock option program. (Compl., ¶ 37). Specifically, the SEC maintains Shanahan Jr. and others approved proxy statements containing Compensation Committee Reports falsely stating all options had been granted at an exercise price equal to the fair market value of the stock on the date of the award. (Id., ¶ 38).[5] By failing to disclose the awards of in-the-money stock options, ESSI concealed material amounts of compensation paid to its top executives. (Id., ¶ 39). The SEC further alleges Shanahan Jr. approved and signed ESSI's Form 10-K annual reports filed with the Commission, its Form S-8 registration statements, and its Forms 4 and 5, knowing that those forms contained materially false and misleading statements and omissions of material fact concerning ESSI's stock option program. (Id., ¶ 43, 45-46).

The SEC filed its Complaint against Shanahan Jr. on July 12, 2007. Based on the foregoing allegations, the Commission asserts the following claims for relief against Shanahan Jr.: Violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a) (Count I); Violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5 (Count II); Violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Exchange Act Rule 14a-9, 17 C.F.R. § 240.14a-9 (Count III); Aiding and Abetting

---

[5] The SEC alleges the proxy statements were filed with the Commission, distributed to shareholders, and incorporated by reference in the Company's registration statements filed with the Commission. (Compl., ¶ 38).

ESSI's Violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Exchange Act Rules 12b-20 and 13a-1, 17 C.F.R. §§ 240.12b-20, 240.13a-1 (Count VI); and Aiding and Abetting ESSI's Violations of Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A) (Count VII)[6]. (Compl., ¶¶ 52-60, 67-74).

In support of his defense of this case, Shanahan Jr. seeks to introduce the testimony of an expert witness, Mr. Ernest L. Ten Eyck. In its Motion to Limit Opinion Testimony, the SEC maintains several of Mr. Ten Eyck's opinions are inadmissible under both the Federal Rules of Evidence and the Supreme Court's ruling in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

## DISCUSSION

### I. Standard For Daubert Motions

Under Eighth Circuit law, "[d]ecisions concerning the admission of expert testimony lie within the broad discretion of the trial court." Anderson v. Raymond Corp., 340 F.3d 520, 523 (8th Cir. 2003) (internal quotations and citation omitted). As a preliminary matter, "[t]he proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." Lauzon v. Senco Products, Inc., 270 F.3d 681, 686 (8th Cir. 2001) (citation omitted). The starting point for analyzing expert testimony is Federal Rule of Evidence 702, which provides in part as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

---

[6] Count VII of the SEC's Complaint was dismissed in an Order entered January 12, 2010. (Doc. No. 160).

Id. "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony," and "[t]he rule clearly is one of admissibility rather than exclusion." Lauzon, 270 F.3d at 686 (internal quotations and citations omitted).

Pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., the seminal case regarding expert opinion testimony, "district courts are to perform a 'gatekeeping' function and insure that proffered expert testimony is both relevant and reliable." Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997) (citations omitted), cert. denied, 523 U.S. 1004 (1998); see also Daubert, 509 U.S. at 592-93. Thus, in order to be admissible under Rule 702, the proposed expert testimony must meet the following three prerequisites:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

Lauzon, 270 F.3d at 686 (internal quotations and citations omitted).

## II. Proffered Opinions

### A. Section VII

In Section VII of his report, Mr. Ten Eyck first explains the roles of a corporate board of directors in general, and of the ESSI Board of Directors in particular. (Expert Report of Ernest L. Ten Eyck ("Report"), PP. 16-18). He further explains the committee structure within the ESSI Board of Directors, and the various stock option plans in place during the relevant time period. (Id., PP. 17-19). In performing this analysis Mr. Ten Eyck reviewed, among other things, ESSI By-Laws and SEC filings. Mr. Ten Eyck continues to explicate the process by which stock options allegedly were granted at ESSI, and opines that while the record suggests Compensation Committee members such as Shanahan Jr. were involved in all aspects of compensation, including salaries, cash bonuses,

and stock options, they viewed their role as one of oversight, and focused on allocating stock options rather than selecting grant dates or exercise prices. (Id., PP. 19-20). Mr. Ten Eyck apparently bases this opinion solely on his review of the deposition testimony of Shanahan Jr. and others. He then reaches the qualified conclusion that, "[a]ssuming this [deposition testimony] is a correct description of the Compensation Committee's role," then the allocation of responsibilities at ESSI was neither unusual nor improper.

Upon consideration, the Court will grant the Commission's motion to exclude testimony related to the opinions set forth in Section VII of Mr. Ten Eyck's report. The Court first finds Mr. Ten Eyck's dissertation on the role of corporate boards in general is not relevant to any issue in this case. With respect to the structure and constitution of the Board of Directors at ESSI, the Court finds fact witnesses are far better equipped to provide such information to the jury, and expert testimony simply regurgitating information found in deposition testimony, corporate by-laws and other documentation is neither appropriate nor necessary. Finally, the Court finds Mr. Ten Eyck's opinion regarding the propriety of Shanahan Jr.'s alleged actions or inactions invades the province of the jury. In other words, he reaches his conclusion that Shanahan Jr. engaged in no wrongdoing only by accepting Shanahan Jr.'s and others' descriptions as true, not by relying on accepted standards or practices in the industry. Holloway v. Ameristar Casino St. Charles, Inc., 2009 WL 5169535 at *4 (E.D. Mo. Dec. 18, 2009). This type of conclusion does not assist the trier of fact, and thus must be excluded. Id. See also United States v. Farrell, 563 F.3d 364, 377 (8th Cir. 2009) (internal quotations and citations omitted) ("While expert testimony may be used to assist the trier of fact to understand the evidence or to determine a fact in issue, an expert witness may not usurp the jury's function to weigh evidence and make credibility determinations"); In re Genetically Modified Rice Litigation, 2009 WL 3281928 at *12 (E.D. Mo. Oct. 9, 2009) (internal quotations and

citation omitted) ("Expert witnesses must do more than simply summarize documents with a tilt favoring a litigant.").

**B.** **Section VIII**

In Section VIII of his report, Mr. Ten Eyck again relies on Shanahan Jr.'s deposition testimony to posit that he was not involved in establishing stock option exercise prices. (Report, PP. 20-21). He continues to opine as to who was responsible for determining the strike prices of option awards and financial reporting at ESSI, based again on his review of ESSI's corporate forms and the deposition testimony of Shanahan Jr. and others. (Id.). Mr. Ten Eyck then devotes numerous paragraphs in his report to his view that, based on his lack of training, and his belief that others with expertise and experience were behaving appropriately, Shanahan Jr. reasonably believed the controls, policies and procedures regarding stock option grants and accounting at ESSI were adequate.[7] (Id., PP. 21-28).

Upon consideration, the Court finds the opinions in Section VIII of Mr. Ten Eyck's report do not constitute proper expert analysis, for the same reasons set forth in Section II(A), supra. In other words, the Court finds Shanahan Jr. himself is in a better position to explain to the jury both his actions and/or inactions, and his alleged lack of training, misunderstanding of the accounting principles at issue, and reliance on the advice of others. In the guise of expert testimony, Mr. Ten Eyck offers opinions that simply bolster Shanahan Jr.'s account by accepting it at face value. As stated above, it is the jury's role both to credit or discredit any testimony from Shanahan Jr., and to determine whether it finds his actions to have been reasonable in light of the circumstances. See U.S. ex rel. Anti-Discrimination Center of Metro New York, Inc. v. Westchester County, N.Y., 2009 WL

---

[7] Once again, Mr. Ten Eyck cautions that his conclusions are valid only if the factual record is as he has outlined. (Report, P. 22).

1110577 at *2 (S.D. N.Y. Apr. 22, 2009) (citations omitted) ("It is appropriate, therefore, to exclude expert testimony offered to bolster the credibility of fact witnesses."). This portion of the SEC's motion must therefore be granted.

### C. Section IX

Section IX of Mr. Ten Eyck's report addresses Shanahan Jr.'s role in ESSI's alleged failure to maintain proper records reflecting option grant dates. (Report, PP. 28-29). Such testimony is unnecessary in light of this Court's dismissal of Count VII of Plaintiff's Complaint, and so the Court will deny this portion of Plaintiff's motion as moot.

### D. Section X

In Section X of his report, Mr. Ten Eyck opines the SEC fails to explain the full extent of any alleged financial impact resulting from Shanahan Jr.'s actions or failures to act because, among other things, the amount of the supposed misstatement as a result of "backdated" and/or unauthorized options is unsupported, and no restatement of ESSI financial statements ever occurred. (Report, PP. 29-30). The SEC notes alleged flaws in the underpinnings of Mr. Ten Eyck's conclusions. Under Eighth Circuit law, however, "'[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.'" Nebraska Plastics, Inc. v. Holland Colors Americas, Inc., 408 F.3d 410, 416 (8th Cir. 2005), quoting Hartley v. Dillard's, Inc., 310 F.3d 1054, 1061 (8th Cir. 2002) (citation omitted). The expert's opinion thus should be excluded only when it is, "so fundamentally unreliable that it can offer no assistance to the jury." Harrington v. Sunbeam Products, Inc., 2009 WL 701994 at *4 (E.D. Mo. Mar. 13, 2009) (internal quotations and citation omitted). In the instant case, the Court finds the conclusions set forth in Section X of Mr. Ten Eyck's report are sufficiently reliable to assist the jury's determination of a disputed issue, and Plaintiff's

assertions concerning flaws in his methodology and/or assumptions, "are proper subjects for its own expert testimony and for thorough cross-examination before the trier of fact." Harrington, 2009 WL 701994 at *4. See also Lauzon, 270 F.3d at 695 ("It is far better where, in the mind of the district court, there exists a close case on relevancy of the expert testimony in light of the plaintiff's testimony to allow the expert opinion..."). This portion of Plaintiff's Motion to Limit Opinion Testimony will therefore be denied.

### E. Section XI

Section XI of Mr. Ten Eyck's report restates his conclusions. The Court holds Mr. Ten Eyck properly may offer conclusions on any allowable testimony, but not on any testimony precluded by the terms of this Order.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Limit Opinion Testimony of Ernest L. Ten Eyck (Doc. No. 100) is **GRANTED** in part, **DENIED** in part, and **DENIED** as moot in part, in accordance with the foregoing.

Dated this 26th day of January, 2010.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE