IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MISSOURI

EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 4:07-CV-270-JCH |
| Plaintiff, | (Consolidated with Case No. 4:07-CV-1262) |
| v. | Hon. Jean C. Hamilton |
| MICHAEL F. SHANAHAN, JR., | |
| Defendant. | |

---

### DEFENDANT MICHAEL F. SHANAHAN, JR.'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND INCORPORATED MEMORANDUM IN SUPPORT

---

## I.    Introduction

The SEC's case has fallen flat.  After eight days of trial testimony, the SEC's witnesses have completely failed to show that Shanahan, Jr. knowingly backdated options or engaged in any sort of intentional behavior.  Contrary to the allegations of the Complaint and the promises made in the SEC's opening statement – which were replete with claims of a "backdating scheme," "stealth compensation" and the like – the evidence has shown nothing of the sort. Lacking any direct evidence of intentional conduct, the SEC's case has become a desperate effort to label Shanahan, Jr.'s lack of knowledge as reckless or negligent.  But even that effort has failed, as the evidence has shown the difficulties inherent in determining the proper grant date of options, making it impossible to impose those labels as a matter of law.

Shorn of the inflammatory and extraneous matters that the Court properly excluded *in limine*, the SEC's case can be seen as the empty space it truly is.  There is not a scintilla of evidence that would allow a jury to conclude that Shanahan, Jr. acted intentionally, with severe recklessness, or even negligently.  The last chapter and long ordeal of the Shanahan family with

1

respect to options backdating should be ended now, and without the need to submit this complex matter to a jury.

## II.    The SEC's Allegations

As the Court is well aware, this is a securities fraud case premised on allegedly false statements relating to options backdating. In the SEC's own words, "[t]he factual predicate for the Commission's claims in this matter is simple: (1) Shanahan, Jr. helped to lead a scheme, involving other individuals at ESSI, to provide unauthorized compensation to Shanahan, Sr. and other ESSI employees and directors, including himself, by falsifying the purported dates on which stock options were granted; and (2) this practice contradicted affirmative statements regarding stock option pricing and executive compensation made in ESSI's proxy statements, Form 10-K annual reports, and Form S-8 registration statements." See Plaintiff Securities and Exchange Commission's Trial Brief at 1-2, Docket No. 170 (Jan. 12, 2010).[1]

The alleged misrepresentations in these securities filings consist of virtually identical language. Specifically, the SEC alleges that the proxy statements and the attached stock option plans "stated that all options had been granted at an exercise price equal to the fair market value of the stock on the date of the award," and that "options granted under the plan would be granted at fair market value on the date of the award." Compl. ¶¶ 38, 40, Docket No. 1-1 (July 12, 2007). With respect to the Forms 10-K, the SEC alleges that ESSI "falsely represented that the Company's stock options are granted at an option price equal to the market value on the date the option is granted." Id. ¶ 43. And with respect to the Forms S-8, the SEC alleges that the description of the stock option plans and the plans themselves "expressly stated that options under each plan were to be granted at the fair market value of the Company's stock on the date of the award." Id. ¶ 45. For ease of reference, this Motion refers to this language collectively in its slightly varying forms as the "Option Pricing Sentence."

In its Complaint, the SEC has alleged four claims against Shanahan, Jr:

---

[1] The Court's case management order required the parties to file trial briefs "stating the legal and factual issues and authorities relied on and discussing any anticipated substantive or procedural problems." See Case Management Order at 4, Docket No. 6 (Jan. 15, 2009).

- *Claim 1.* As formulated by the SEC in its proposed jury instructions, Claim 1 alleges that Shanahan, Jr. violated Section 17(a)(2) and (3) by obtaining money or property by means of a material misrepresentation or omission, or by engaging in a transaction, practice, or course of business which operated as a fraud or deceit. See Plaintiff's Proposed Jury Instructions at 25 (Proposed Ins. 22), Docket No. 163 (Jan. 12, 2010).

- *Claim 2* alleges that Shanahan, Jr. violated Section 10(b), and Rule 10b-5 by making a false statement or omission of material fact, with scienter, in connection with the purchase or sale of securities. See *id.* at 26; *id.* at 25 (explaining that Section 17(a)(1) is to be considered together with Claim 2).

- *Claim 3* alleges that Shanahan, Jr. committed proxy fraud in violation of Section 14(a) and Rule 14a-9.

- And finally, *Claim 4* alleges that Shanahan, Jr. "knowingly" aided and abetted ESSI's violations of Section 13(a) and Rules 12b-20 and 13a-1 of the Exchange Act by providing substantial assistance to ESSI's filing of annual reports. See Compl. ¶ 70 (alleging "knowing[]" conduct).

While the Complaint alleges that Shanahan Jr. received "unauthorized" *numbers* of options in excess of those purportedly permitted under the Non-employee Director stock options plan, that is alleged solely for the purposes of relief, and is not a "violation" for the jury's consideration.

### III.    The Evidence at Trial

As the Court will recall, the SEC has presented 13 witnesses, 8 live and 5 via deposition testimony.

1.    *Randall Heron.* This expert witness testified to the analyses he did to express an opinion that options backdating occurred at ESSI between 1996 and 2006. Over objection, he also testified to his non-expert interpretation of the options plans in use at ESSI, but his opinions were contradicted by (among other things) the scholarly articles of his business partner, Dr. Erik Lie, which were admitted into evidence.

2.    *Steven Landmann.* On direct examination, Landmann testified that starting in December 1996, he was instructed by ESSI's CFO, Gary Gerhardt, to use options grant dates that corresponded to low points in the ESSI stock price rather than the dates of Compensation Committee approval, which Landmann perceived to be the proper grant dates under the relevant ESSI options plan. Landmann claimed that he protested to Gerhardt initially, and that Gerhardt told him he had conveyed his concerns to Shanahan, Sr., but that they would go with the dates as

3

directed by "senior management."  Trial Tr., Vol. 2-B at 87-90.  Landmann claimed that he followed Gerhardt's instructions because he was afraid of being fired by Shanahan, Sr., and by May 2000 had stopped protesting.  *Id.* at 91.  At no point in his testimony did he claim that he received instructions from, or communicated with, Shanahan, Jr. as to options pricing.  The bulk of the direct examination was devoted to establishing that award letters for numerous grants in the 1996-2002 time period were sent out later than the purported grant date.  On cross-examination, Landmann admitted (among many other things) that he did not believe at the time that anything he did was illegal, and that he repeatedly lied to cover-up his backdating activity. Trial Tr., Vol. 5-A at 31-33.  He also admitted to numerous scenarios in which determining the grant date was in a "gray area," required legal analysis, or was otherwise ambiguous; and that in his initial interview with government employees on June 9, 2006, he failed to identify as backdated many of the options now alleged in the SEC's complaint.

       3.     *Gary Gerhardt*.  Gerhardt testified that Landmann was "lying," and denied being told by Landmann that the options pricing activity they engaged in was improper under the options plan or otherwise.  Trial Tr., Vol. 6-A at 31:24-32:8.  Gerhardt testified that he "assumed."  Shanahan, Jr. was aware of the options pricing practices at ESSI because Shanahan, Jr. had sent him the fax with the "5-4-00" date on the typewritten portion (PX 6), but provided no evidence to suggest that Shanahan, Jr. had selected that price or was aware of how it was selected.  *Id.* at 36-37.  He did not testify that he had any conversation with Shanahan, Jr. (or Sr.) regarding stock option pricing.

       4.     *Shanahan, Sr.*  The direct examination of Shanahan, Sr. was devoted largely to eliciting his admission that he was reckless in disregarding the falsity of the July 24 date in the July 2002 award letters.  Shanahan, Sr. provided no evidence whatsoever against his son, and denied any knowledge of backdating or other wrongdoing in the pricing of options at ESSI.

       5.     *Shanahan, Jr.*  The examination of Shanahan, Jr. was entirely exculpatory.  He testified that his role on the Compensation Committee was devoted solely to issues of options allocation, not pricing, and that he believed determining the grant date was the job of the Finance Department.  He further testified that he had no idea how the proper grant date of an option was

4

to be determined.

6.  *General Lewi*.  This video testimony corroborated Shanahan, Jr.'s account of the role of the Compensation Committee.  General Lewi testified that the Compensation Committee dealt only with allocation of options, not pricing; and that he, too, had no idea at the time how the grant date was to be determined.

7.  *Thomas Litz*.  The brief examination of Litz revealed only that he previously concluded that the Compensation Committee had the ability to construe and interpret the stock option plan in order to answer a question as to which the plan was silent.  Trial Tr., Vol. 7-B at 101:22-102:2.  Litz also confirmed that Mattern, Landmann, and Gerhardt were the only three persons that Litz interacted with when advising as to stock options.  See *id.* at 103:11-14.

8.  *Gerald Daniels*.  Examination of this former CEO of ESSI elicited nothing more than two anecdotes, one in which Daniels mistakenly thought that Shanahan, Jr. was the Chairman of the Compensation Committee, Trial Tr., Vol. 8-B at 44-45; and another in which Shanahan, Sr. indicated that he needed to check on the propriety of granting certain options. Trial Tr., Vol. 8-B at 41-42.

9.  *Selman Akyol* (live); *Martha Carter* (video); *Thomas Weinstein* (deposition testimony read in court); *Walter Kirchberger* (video); *Eric Roiter* (video).  Examination of these investment professionals was devoted principally, if not entirely, to the issue of materiality.

## IV.    Argument

Under Rule 50, judgment as a matter of law is proper when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1). Although the Court views the evidence in the light most favorable to the nonmoving party without weighing the evidence or assessing credibility, the Court may draw only *reasonable* inferences from the evidence in favor of the nonmoving party.  A reasonable inference cannot rest on speculation, and it cannot contradict the undisputed facts of a case.[2]  Nor may the

---

[2] See *First Union Nat'l Bank v. Benham*, 423 F.3d 855, 863 (8th Cir. 2005) (quoting *Fought v.*

nonmoving party avoid judgment where its proof rests on a "mere scintilla of evidence."[3]

**A.**    **Shanahan, Jr. Is Entitled to Judgment as a Matter of Law on the Fraud-Based Claims Under Counts 1 2, and 3.**

As noted above, the entirety of the SEC's case hinges on the Options Pricing Sentence, which appeared in the ESSI securities filings in a variety of forms. The core of the SEC's claim is set out in Paragraph 3 of the Complaint, as follows: "During this period of time, Engineered Support regularly issued proxy statements, annual reports, and registration statements, approved and in many cases signed by the Shanahans, which represented that the Company's stock options had been and would be issued with an exercise price equal to the closing market price on the date of the award." See also Compl. ¶ 18 ("The Company explicitly stated in both plans that all options were to be granted with an exercise price equal to the closing price of Engineered Support's common stock on the date that the options were granted."). The Complaint then alleges that "Engineered Support repeatedly issued backdated options that contained a lower exercise price than the price of the Company's common stock on the date the options were awarded. This practice violated the terms of Engineered Support's stock option plans and was contrary to representations made to the shareholders." *Id.* ¶ 21.

During its case-in-chief, the SEC dwelled at length on the version of the Options Pricing Sentence that appears in the options plans themselves. To establish its case against Shanahan, Jr. through these allegations, the SEC must establish (1) that the stock option plans were in fact violated, and then (2) that Shanahan, Jr. participated in that violation with the requisite scienter. The SEC has failed to adduce sufficient evidence as to both issues.

**1.**    **The SEC Has Failed to Prove that The Plans Were Violated.**

The SEC's limited evidence related to the meaning of the Options Pricing Sentence found

---

*Hayes Wheels Int'l, Inc.*, 101 F.3d 1275, 1277 (8th Cir. 1996)) ("A reasonable inference is one which may be drawn from the evidence without resort to speculation.") (internal quotation marks and citations omitted); *Sip-Top, Inc. v. Ekco Group, Inc.*, 86 F.3d 827, 830 (8th Cir. 1996). ("Although we must give Sip-Top the benefit of all reasonable inferences, we may not accord a party the benefit of unreasonable inferences or those at war with the undisputed facts.") (internal quotation marks and citation omitted).

[3] See *SEC v. Adler*, 137 F.3d 1325, 1340 (11th Cir. 1998); *Wallace v. Methodist Hosp. System*, 271 F.3d 212, 219 (5th Cir. 2001).

in the stock option plans falls woefully short of establishing any definite meaning of the Option Pricing Sentence.  Therefore, the SEC cannot possibly prove that the stock option plans were in fact violated.

The language in every plan is the same in relevant part: the option exercise price "shall be the closing price of the Stock on the date the Stock Option is granted."  The SEC's expert witness, Professor Randall Heron, though not offering an expert opinion on the issue (Trial Tr., Vol. 2-A at 12:4-5), testified that *he* understood the Option Pricing Sentence to require that the exercise price be equal to the market price on the date of the Compensation Committee meeting to approve the award of options.[4]  While Professor Heron testified that the grant date and the decision date had to be the same, he struggled to identify explicit language which pinpoints such a claim.  Rather, Professor Heron explained that he reached his interpretation by assuming that the "date of the grant" language referred to a meeting of the Compensation Committee because the committee was the administrator of the plan and "I would assume they – the compensation committee has to meet to make the award."[5]  Moreover, Professor Heron conceded that stock option plans may not always prohibit retrospective pricing and agreed with a statement he made in a prior article he wrote that there was "apparent confusion about the legality of such manipulations among many parties involved." Trial Tr., Vol. 2-A at 48.[6]

In contrast to Professor Heron's less-than-clear reading of the Option Pricing Sentence, however, is the journal article authored by his colleague, Dr. Erik Lie, in 2005[7] (admitted

---

[4] "Based on my reading of the plans, the regular plan provided for the option strike price to be set as the closing price as the day of – that the award was actually made.  My understanding would be that that would be when the compensation committee who administers the plan finalizes and decides this is when the award's going to take place, the pricing is dictated for them."   Trial Tr., Vol. 2-A at 12:24-13:6.

[5] Trial Tr., Vol. 2-A at 51:19-52:3; see also *id.* at 52:24-25 ("I assume they would have to meet or otherwise get together in some form to make the award.").

[6] Professor Heron noted further that certain options plans may "perfectly permit backdating." Trial Tr., Vol. 2-A at 46:24-47:22.  Indeed, Professor Heron ultimately agreed that where a "plan permits picking a grant date prior to the decision date," such pricing practices would not really be "backdating" at all.  Trial Tr., Vol. 2-B at 39:3-11.

[7] Dr. Lie is the same colleague with whom Professor Heron wrote to the *Wall Street Journal* and touched off the "backdating" scandal in the media.

without objection through Professor Heron as Defendant's Exhibit V016).  Although Dr. Lie

posited that some option grants may have been backdated, he cautioned that "it is not clear that

retroactive timing is in violation of stock option plans,"[8] and noted that the stock option plans he

had reviewed were "vague as to how the grant date should be determined."  Trial Tr., Vol. 2-A at

81:18-82:10; see also Trial Tr., Vol. 2-A at 83:4-6 (acknowledging Dr. Lie wrote that "[s]tock

option plans are vague as to how the grant date should be determined, and do not specifically

prohibit the grant date from preceding the decision date.").  Three different times in a ten-page

article, Dr. Lie emphasized his point that stock options plans do not specifically prohibit "the

grant date from preceding the decision date."  Moreover, as Professor Heron admitted, Dr. Lie's

observations were based on language in stock option plans that is virtually identical to the Option

Pricing Sentence.[9]  Specifically, Dr. Lie stated: "plans generally state that the exercise price

should be the market price at the grant date, but do not state that the grant date cannot precede

the decision date."  See DX V016 at 807.

      Professor Heron acknowledged an incredibly close relationship with Dr. Lie, including

writing numerous articles together, partnering in a consulting firm, and even working together on

the report on ESSI.  Then, during his testimony regarding the Lie article – an article which he

reviewed and provided comments, but never found anything with which he disagreed – Professor

Heron admitted that he and Dr. Lie held different views as to the interpretation of the Option

Pricing Sentence:

> Q:    ["]The plans generally state the exercise price should be the
> market price at grant date, but do not state that the grant date
> cannot precede the decision date.["]  Do you see that?

---

[8] See also Trial Tr., Vol. 5-A at 173:16-20 (quoting Dr. Lie as writing: "[s]econd, it is not clear that retroactive timing is in violation of the stock option plan.  In fact, the standard legal document behind the stock option plan does not specify whether a grant date can be set retroactively.").

[9]
    A:    I don't think he's referring to all stock option plans.

    Q:    No, he's referring to ones that generally state the exercise price should be the market price at the grant date, isn't he?

    A:    Yeah.

Trial Tr., Vol. 2-A at 86:11-16.

A:      I see what he's written.

Q:      Do you disagree with it?

A:      My opinion here is not the same as his – what he's written here.

Q:      So you disagree with him?

A:      Yeah.

Trial Tr., Vol. 2-A at 85:9-12.

What's more, on further reflection, Professor Heron suggested that the reason why Dr. Lie disagrees with him is because Dr. Lie does not have sufficient knowledge of the applicable accounting principles – something which he acknowledged most stockholders similarly lack:

> Q:      Because your partner, your partner in your consulting firm, the man you have co-written any number of extensive articles on, the man you say is at least as good an expert in this area as you, disagrees with you that grant date can't precede the decision date, doesn't he?
>
> A:      I can see what he's written here. ***I can say that he does not have the background that I have in accounting.*** I'm not an accounting expert. On most of the later stuff that we have done, I have been the one that sorted out the accounting.
>
> Q:      Okay. Do most stockholders have an accounting background?
>
> A:      I would say most stockholders do not have an accounting background.

Trial Tr., Vol. 2-A at 88:24-89:12 (emphasis added).[10]

What is clear from Professor Heron's testimony at trial, therefore, is that what Professor Heron is really doing is applying his own understanding of the accounting rules to read the Option Pricing Sentence. That is, Professor Heron determines the "grant date" of stock options with reference to the "measurement date" under Accounting Principles Board Opinion No. 25, which focuses on the date of *approval* of both the persons to receive options and the number to be awarded. Between his understanding of APB 25 and his understanding that the administrator of the stock option plan is the Compensation Committee, therefore, Professor Heron concludes

---

[10] At other times, Professor Heron more readily admitted that the language in ESSI's stock option plan is susceptible to more than one meaning: "Q: So it's possible that somebody else looking at this might have a different interpretation of what it means to have full power to give awards; right? A: It's possible that other – you know, if – when you say is it possible for someone to have a different interpretation? That's clearly possible." Trial Tr., Vol. 2-A at 136:11-16.

that the grant date should be "when the compensation committee who administers the plan finalizes and decides this is when the award's going to take place, the pricing is dictated for them."  Trial Tr., Vol. 2-A at 12:24-13:6.

By Professor Heron's own testimony, therefore, *only with knowledge of the appropriate accounting rules* might Shanahan, Jr. (or the vast majority of stockholders) have similarly read the Option Pricing Sentence through an accounting lens, such that the "grant date" should be read to mean the "measurement date" (as defined by APB 25).  And only with an understanding of the definition of "measurement date" could Shanahan, Jr. have read the Option Pricing Sentence to prohibit the grant date from preceding the date of the Comp Committee meeting.[11]

But the SEC's attempt to establish that the Option Pricing Sentence prohibited the grant date from preceding the decision date was undercut by more than just Professor Heron and Dr. Lie.  Indeed, not even the only other SEC witness with knowledge of accounting principles agreed with Professor Heron's interpretation of the Option Pricing Sentence.  Steve Landmann was the only percipient witness in the SEC's case who is a Certified Public Accountant.  On cross-examination, Landmann testified that there are any number of factual scenarios in which the proper grant date would *not* be the date of the Compensation Committee meeting, and subject to debate among accountants[12] – testimony that has particular significance with respect to the

---

[11] In fact, as Landmann later acknowledged, these accounting rules for interpreting the "date of the grant" language in the Option Pricing Sentence are themselves subject to change; Financial Accounting Standards Board Statement No. 123 (revised 2004) later directed that the proper "grant date" should be when the options are actually *received* by the employees, not when they are approved with finality.  Trial Tr., Vol. 5-A at 171:19-24 ("Didn't there come a time when FASB, the Financial Accounting Standards Board, decided in an opinion that the grant date ought to be the date that the employee receives the award?  Didn't that actually happen?  A. I think that's true.").

[12] See, e.g., Trial Tr., Vol. 4-B at 23:3-24:18 ("A.  Yeah, I think you could find people on both sides of that argument.  On one side would be the individuals who would – who would argue basically what I would say; that unless you're on – you know – If you're on a list and your [sic] approved, you get whatever, you know.  And let's say Capeless is left off of this list I'm talking about.  All those on that original list would be given – granted options as of whatever date the grant date was set at, and those same people would argue that – that Capeless, whenever he's approved, would get it.  Q.  In terms of the people having this debate, and this is not a barroom conversation; people that, you know, are drinking a beer are not talking about, 'Gee, what do you do with Capeless and what grant date should he get?'  That's a debate among accountants and lawyers, wouldn't you say?  A.  Yeah, I would think primarily.").

reality of the options granting process at ESSI, which Landmann testified was "very informal" at the time.  Trial Tr, Vol. 4-A at 61:7-24.

But his testimony went even further.  Critical to the determination as to whether the SEC can establish that the Stock Option Plans were violated because the grant date and decision date must be the same, Landmann testified that the plans permitted the Compensation Committee to meet on one day and pick a date in the future to be the grant date;[13] even, perhaps, a range of future dates.[14]  Within this testimony, Landmann specifically agreed that the grant date did not have to be the same as the decision date.  Moreover, he acknowledged that there was nothing in the Option Pricing Sentence which dictated that the grant date could follow the decision date but could not preceded the decision date.  See Trial Tr., Vol. 5-A at 165:12-166:14.

> Q:     … If I understand you correctly, what you just said is that it would be perfectly appropriate for the grant date to be set by the comp committee for a date in the future.
>
> A:     Yes.
>
> Q:     So the grant date does not have to be the same as the decision date by the compensation committee; fair?
>
> A:     Correct.
>
> Q:     **So the specific language does not tie grant date and decision date under this plan; right?**
>
> A:     **Correct.  It talks about the grant date**.
>
> Q:     So what language is there in that sentence that says the grant – grant date can follow the decision date but it can't precede the decision date?  Is there anything in there that prohibits the situation where the grant date precedes or goes after the decision date?
>
> A:     There's nothing in this sentence that indicates that….

Trial Tr., Vol. 5-A at 167:1-18 (emphasis added).  Though Landmann claimed that there were

---

[13] *Id.* at 29:14-21.

[14] *Id.* at 30:1-31:25 ("A. You know, the plan is then specific to that kind of arrangement.  The plan is silent as to – to that kind of thing.  Again, knowing the plan and jus what I believe, I don't think that that – it's in a very gray area where you could – you could make the argument that that was not unseemly or out of compliance with the plan. … Q. But a certain amount of interpretation is required from time to time based on situations with acquisitions and other complicated transactions, fair?  A.  Yes, as that question is phrased."); *id.* at 36:15-22.

Indeed, Landmann went so far as to postulate that the Compensation Committee could "delegate[] the approval process" to someone else, such as "Mike Shanahan, Sr., or the Office of the Chairman," *id.* at 22:18-21; *see also id.* at 30:16-17, an interpretation that would seem to take

tax reasons for his position that the grant date could not precede the decision date, when he was asked if he could find any language in the Stock Option Plan itself which supported his position, he could find no such support.

The evidence undercutting any ability to prove that the stock option plans prohibited a grant date which precedes the decision date is overwhelming. Dr. Lie clearly states that options plans "are vague as to how the grant date should be determined." Professor Heron himself wrote and acknowledged on the stand that there existed an "apparent confusion about the legality" of selecting grant dates which preceded the decision date. Professor Heron reviewed with approval Dr. Lie's (his consulting partner and co-writer) article which specifically and repeatedly states that stock option plans do not prohibit grant dates from preceding the decision date. In addition, the SEC's star witness, Steve Landmann, conceded that "the specific language does not tie grant date and decision date under this plan." Under these facts, it is not possible to prove a violation of the plans. At a minimum, the evidence before the Court has established that there is significant confusion as to what the Option Pricing Sentence means.

Once the Court finds that the SEC has failed to prove the Plans were violated, all the other allegations of false and misleading filings fall by the wayside. The language in every filing refers either to "date of the grant" or "date of the award." Both phrases were presumably written to have the same meaning. Therefore, if the SEC cannot prove what the phrase means in the option plans, it cannot prove what it means in the proxy statements, the Forms 10-K, or any other filings.

**2.     The SEC Has Failed to Adduce Sufficient Evidence of Scienter**

Regardless of whether the SEC has adduced sufficient evidence that the ESSI stock option plans were violated, it has utterly failed to adduce sufficient evidence of scienter on the part of Shanahan, Jr.

<u>First</u>, the evidence presented in the preceding section *at least* establishes significant confusion over the meaning of the Option Pricing Sentence. This fact alone mandates a finding

Compensation Committee meetings entirely out of the picture.

that the SEC cannot prove scienter.  If Professor Heron and his colleague Dr. Lie cannot see eye-to-eye on the meaning of the critical plan provision at issue, it is hard to see how it can form the basis for fraud charges against a non-expert.  The SEC has already admitted that Shanahan, Jr. had no knowledge of the particular accounting rules governing option grants; was not responsible for ensuring that ESSI option grants conformed to appropriate accounting rules; and did not know that ESSI's stock options were not properly accounted for.[15]  Compare SEC v. Snyder, 292 Fed. Appx. 391, 402 (5th Cir. 2008) (unpublished) ("According to [the expert witness's] testimony, it would have been obvious to an accountant with Snyder's training that these adjustments, which were not representative of WMI's regular business, were material in the aggregate and were required to be disclosed in the Form 10-Q.") (emphasis added).  In light of these admissions, no reasonable inference can be drawn that Shanahan Jr. would have understood the Option Pricing Sentence to mean that the "date of the grant" should correspond to meetings of the Compensation Committee.  See SEC v. Todd, No. 030V2230, 2006 U.S. Dist. LEXIS 41182, at *20 (S.D. Cal. May 23, 2006) (granting summary judgment to the defendant because "knowledge of the existence of the transactions does not allow a reasonable fact-finder to draw an inference that Weitzen had knowledge of their impropriety, or was reckless in not knowing.  Weitzen was not an accountant, nor has evidence been proffered that he had any reason to have accounting expertise sufficient to challenge the treatment given to any particular transaction.") (emphasis added).

On this basis alone, the SEC cannot prove that Shanahan, Jr. consciously disregarded an extreme and obvious risk that ESSI's options granting practices violated the Option Pricing Sentence.  See SEC v. Lucent Technologies, No. 04-2315, 2005 WL 1206841, at *5 (D.N.J. May 20, 2005) (noting that the SEC had offered "no compelling reason why this Court should charge regular business people with knowledge of accounting principles").

Second, the SEC adduced no evidence at trial that established scienter by Shanahan, Jr.,

---

[15] See Plaintiff's Responses to Shanahan Jr.'s Second Set of Requests for Admission at 6, 12- (Requests for Admission No. 31, 46, 47) (attached as Exhibit 12 to the Declaration of Jennifer A. Huber in Support of Shanahan Jr.'s Motion for Summary Judgment, Docket No. 110 (Oct. 7,

and a wealth of evidence that *undercut* scienter. There was remarkably little evidence against Shanahan, Jr. in particular: the SEC's two principal witnesses (Landmann and Gerhardt) barely mentioned him. There was no evidence that anyone ever *told* Shanahan Jr. that the option pricing practices at ESSI were in violation of the plans or otherwise improper. Indeed, although Landmann apparently believed that the dates he was getting from Gerhardt were not in compliance with the ESSI stock option plans, even he did not think he was engaging in illegal activity.[16] Nor did Gerhardt perceive any improprieties.[17] And Gerhardt was the exclusive conduit of information to Landmann, who stated repeatedly during the trial that the *only person from whom he received options prices* was Gerhardt, and that he never received information from the Compensation Committee at all. Trial Tr., Vol. 2-B at 66:15-67:8 ("I never received anything from the Compensation Committee … in terms of an approved list or approved minutes that included the list of people that were to receive options, the amount that they were to receive and the date that it had been approved or granted."); *id.* at 72:4-22. Far from pointing the finger at any member of the Compensation Committee, Landmann testified that he had little visibility into its affairs.[18]

   Although Landmann testified that he informed Gerhardt of his concerns that the grant dates were not in accordance with what he perceived the options plan to require, *id.* at 79:1-3, 82:18-84:1 (a claim which Gerhardt flatly denied, *see* Trial Tr., Vol. 6-B at 29:18-22), neither Landmann nor Gerhardt, or any other witness for that matter, testified that Shanahan, Jr. was similarly informed that ESSI's options granting practices were in any way improper. Indeed, Landmann testified to the exact opposite: that he *wished* he *had* "talk[ed] to every single Director, talk to every – talk to Mike Shanahan, talk to, you know, anyone that needed to – to

---

2009).

[16] Trial Tr., Vol. 5-A at 31:21-32:18.

[17] Gerhardt maintained his unawareness of any options backdating improprieties during the relevant time period. See Trial Tr., Vol. 6-B, 32:18-21.

[18] Trial Tr., Vol. 4-B at 42:13-43:23; Trial Tr., Vol. 2-B at 74:24-75:6 (Landmann "[didn't] know that the Compensation Committee always got involved in – in those grants. I think that that function was at the – Frankly, I believe that Mike Shanahan, Sr., effectively oversaw the completion of that function, the granting function.")

14

know about this." Trial Tr., Vol. 2-B, at 89:22-25. His testimony that he did not do so is
undisputed. Similarly, the testimony of the SEC's star witness – Gary Gerhardt – failed to
implicate Shanahan, Jr. in any backdating scheme. With respect to the June-July 2002 time
frame, for example, Gerhardt testified that not only did he have no recollection of how the price
of options was determined, but that Shanahan, Jr. was primarily involved in determining "the
number of shares and to whom those were allocated" – not pricing at all.[19] And while Gerhardt
noted that he *assumed* Shanahan, Jr. was aware of dating discrepancies because of his signature
on the July 17, 2000 fax, that evidence goes to Gerhardt's state of mind, not Shanahan, Jr.'s.

The SEC's scienter case fared no better on the documentary evidence. The SEC
introduced three emails as to Shanahan, Jr., but none are sufficient to allow a jury to infer
scienter without other evidence (which was conspicuously absent). The July 17, 2000 fax from
Shanahan, Jr. to Gerhardt pertaining to the May 4, 2000 option grant (PX 15), merely shows a
notation of "5-4-00" and a notation apparently referring to a stock price (10 13/16). There was,
however, no evidence as to where these notations came from;[20] and in light of the SEC's

---

[19] Trial Tr., Vol. 6-B, at 12:6-13:1 ("A. Mike – Mike Shanahan, Jr., would have been the main
person that I was aware of relative to the board of directors and that's where the final numbers
came from, was from some combination of the board and Mike Shanahan, Jr. Q. And when you
say 'numbers,' what are you talking about? A. I would be talking about the number of shares
and to whom those were allocated. Q. And what about the – the price of the stock option grant?
A. The price – of course, this would be in 2002, the price would have been established by some
combination of everybody involved, basically. Quite frequently we would establish a price and
then we'd go out and resolve a few administrative details, and we may have been stuck with that
price or something like that. But it – it would vary. In 2002 again I don't remember specifically
who grabbed that date and I'm not even sure we knew which date exactly they were actually
finalized, so…").

[20] On cross-examination, Gerhardt agreed that his testimony that Shanahan, Jr. approved a price
to use with respect to the May 4, 2000 option grant rested solely on the assumption that because
Shanahan, Jr. faxed him typed sheet of unknown provenance that already had the date and price
typewritten on them, he assumed that Shanahan, Jr. had approved everything that was on the
sheet. Trial Tr., Vol. 6-A, at 14:23-15:3 ("A. Yes, in either 2000 or 2001 there was a specific – I
believe it was a fax that came from Mike Shanahan, Jr., in which he approved the stock options
and that included a price for the stock options on it. So, therefore, our understanding was he
approved everything included the price."); *id.* at 36:9-12 ("Q. And what you said was, based on
that fax, you assumed that Michael Shanahan, Jr., had approved everything that was on the sheet.
A. Yes."). Gerhardt had no personal knowledge as to who had created the typed document, nor
where the handwritten notation came from: "Whether or not they had the 10 and seventh-eighth
handwritten, I have no idea when or where that came from, but the rest of it was on there." See
*id.* at 49:8-16. At best, therefore, the fax shows nothing more than option allocation activity
taking place after a purported grant date had been set by someone other than Shanahan, Jr.,

15

admission that Shanahan, Jr. did not know the accounting rules,[21] and the fact that Shanahan Jr. signed the accurate date at the bottom, there is nothing in this document to suggest intentional wrongdoing.  Likewise with the "multi-layered" document relating to the 3/29/01 grant (PX 6): again, Shanahan, Jr. signed his initials with the accurate date.  And the July 25, 2002 email (PX 20) shows Shanahan, Jr. *asking questions* and copying General Lewi on his email, conduct utterly inconsistent with scienter.[22]

       Further, it must be kept in mind that this is a *securities fraud* case, and that the gravamen of those offenses is the specific misrepresentation in the securities filing.  As the SEC put it in its opening statement, this is a case about "lies."  Trial Tr., Vol. 1-B, 12:20-13:1.  In that regard, the evidence adduced during the SEC's case as to the circumstances surrounding the making of the statements in the various securities filings is important in evaluating scienter.[23]  The evidence in that regard showed that the Options Pricing Sentence is buried in a footnote to the financial statements, *which routinely were not even included* in the 10-K's sent to the directors for signature.[24]  And the evidence showed that in practice at ESSI, the award letters stated that the price was the "the last closing price of the stock on ___, the Issuance Date," and the "award certificates" stated that the "stock option is dated ___," language confusingly similar to what the Options Pricing Statement disclosed.  (For this reason, the SEC continually tries to paraphrase

---

which would have been innocuous to anyone not thoroughly conversant with the requirements of APB 25.

[21] See note 15, *supra*.

[22] The fact that General Lewi testified that he was out of town and did not recall receiving this email at the time does nothing to undercut the probative value of this evidence as to Shanahan, Jr.'s innocent state of mind at the time he sent the email.  Nor does Landmann's testimony that he was "kind of surprised" by Shanahan, Jr.'s "silly question" and that he supposedly called Shanahan, Jr. to advise "that the Comp. Committee meeting or some sort of approval was required." See Trial Tr., Vol. 3-B at 8:21-10:11.

[23] The SEC presented no evidence whatsoever as to the circumstances surrounding signing of the S-8 registration statements.

[24] Trial Tr., Vol. 5-B at 9:8-9 ("A.  Yeah.  I believe in most instances I sent out just a version of the 10-K absent the financial statements."); *id.* at 15:23-16:8 ("Q. Those are footnotes in the financial statements that weren't in the copies that got sent to the Directors, right?  A.  With this package, correct.  Q.  But that was your standard practice was – I asked you and you told me that was standard practice was not to include the financial statements in the package for signature.  A. I said I believed I did that most of the time.").

the Options Pricing Sentence to include more colorful phrases such as "in-the-money" and the like.)

Third, the combination of the foregoing factors completely negates any possible finding of scienter. Whatever scant inference might have otherwise been gleaned from the date discrepancies on the face of three emails has been negated by this powerful combination of evidence from the SEC's own witnesses. As discussed in Section IV.A.1 above, the meaning of the Options Pricing Sentence is a matter of expert debate. There was no direct evidence of scienter. Landmann admitted that even he did not know how to determine the proper grant date in a variety of circumstances, including when the list of optionees changes (as it did in virtually every option alleged by the SEC);[25] in connection with acquisitions such as the Marlo Coil transaction;[26] or in situations such as the July 2002 series of events, when the Compensation Committee appeared to stop and start during the process of approval.

Given the difficulties in determining a grant date; the specific language of the Options Pricing Sentence and its similarity to the language in the ESSI award letters and certificates; the fact that the SEC has admitted that Shanahan, Jr. did not know and was not responsible for the accounting rules; and the absence of any evidence that Shanahan, Jr. or any other member of the Compensation Committee perceived that the grant date should be the date of a compensation committee meeting, it is simply impossible to infer scienter as to Shanahan, Jr. from the evidence the SEC has adduced at trial.

**3.      The SEC Has Failed to Present Evidence of the Relevant Standard of Care, or that Shanahan, Jr.'s Conduct Constituted an Extreme Departure From It.**

In asserting that Shanahan, Jr. acted with severe recklessness, the SEC cannot rely on its own say-so. In order to gauge whether Shanahan, Jr.'s conduct constituted an extreme departure from the standard of care under the circumstances, the SEC must first adduce evidence of the relevant standard of care, and then establish that Shanahan, Jr.'s conduct was a severe departure from that standard. This standard is a highly fact-specific inquiry that takes into consideration

---

[25] Trial Tr., Vol. 4-B at 21:13-25:13.

[26] Trial Tr., Vol. 4-B at 29:3-33:1.

the actor's education, training, experience; the time period in question; and evidence of industry standards and custom.

The SEC has completely failed to adduce evidence sufficient to establish the standard of care applicable to an outside director of like training, education, and experience with respect to the review of securities filings in the relevant time period.[27]  No expert has offered an opinion on the relevant standard of care, or testified as to industry practice or custom during the 1996-2002 time period.  Compare *Snyder*, 292 Fed. App'x. at 400 (expert testified that "to someone with Snyder's training, education, information, and experience with WMI, it would have been obvious that not disclosing these adjustments in the Form 10-Q rendered it materially misleading"); *SEC v. GLT Dain Rauscher*, 254 F.3d 852, 858-59 (9th Cir. 2001) (finding genuine issues of material fact as to whether "any departure by [the defendant] from the applicable standard was so extreme as to satisfy the element of scienter," in light of expert testimony that he "departed from the standard of the municipal securities industry" and that he "failed to act as a reasonably prudent municipal underwriter") (quotation marks omitted).[28]  To the contrary, the SEC's only expert witness, Professor Heron, effectively admitted that he had "no idea" how persons lacking a background in accounting would read and interpret the Option Pricing Sentence.  Trial Tr., Vol. 2-A at 89:22-24 ("I have no idea if [shareholders'] interpretation would be closer to Erik Lie's in this, what he's written here, or mine.").  Without such evidence, it is impossible to assess the relative propriety of Shanahan, Jr.'s actions; the factfinder could only be speculating.

In *SEC v. Pasternak*, 561 F. Supp. 2d 459 (D.N.J. 2008), for example, the SEC alleged

---

[27] See *In re Mirant Corp. Secs. Litig.*, No. 1:02-CV-1467-BBM, 2003 U.S. Dist. LEXIS 26263, at *63 (N.D. Ga. July 14, 2003) ("Whether a defendant's actions in a Rule 10b-5 case violate the standard of care imposed by the Rule, thus establishing scienter, is a question of fact to be determined as of the time of the actions about which the plaintiff is complaining.") (citation omitted).

[28] See also *In re Safety-Kleen Corp.*, No. 3:00-1348-17, 2004 U.S. Dist. LEXIS 30768, at *4 (D.S.C. Aug. 27, 2004) (permitting defense expert to testify to "general examples of what the expert believed were good corporate practices in conformance with industry custom"); *Pereira v. Cogan*, No. 00 Civ. 619 (RWS), 2002 U.S. Dist. LEXIS 13008, at *14 (S.D.N.Y. July 17, 2002) (noting "no disagreement that experts may testify as to the customary practices in a profession or industry," and permitting expert to describe "a number of examples of what he believes good corporate practices require according to industry and custom").

that the defendants – supervisors and senior executives of Knight Securities, L.P., a registered broker-dealer firm – violated various provisions of the securities laws, including Section 10(b), Rule 10b-5, and Section 17(a).  Among other things, the defendants were alleged to have signed Forms 10-K which falsely stated that Knight Securities provided its customers with "best execution" and failed to disclose the manner in which one of its sales traders priced executions to customers.  During the time period in question, one of the defendants supervised the sales trader, while the other defendant "held ultimate supervisory responsibilities as Knight's CEO and Chairperson of the Board of Directors."  *Id.* at 466.  In finding for the defendants, the court agreed with the defendants that the SEC had utterly failed to establish the standard of care:

> [T]he Court finds that the SEC has not provided the Court with any evidence as to recklessness; the SEC did not proffer any expert witness to attest to the proper standards a supervisor in a market making firm should follow.  Thus, there are no standards by which the Court could judge the actions of Defendants in their supervisory capacity.

*Id.* at 512.  The court further emphasized that in the absence of evidence as to the standard of care applicable to the particular circumstances, the SEC could not even establish a departure from the standard of care, let alone severe recklessness: "The SEC has not presented any evidence as to how John should have responded to the fact that Joseph earned a certain level of profits.  The SEC failed to establish that John deviated from a standard of care applicable to a supervisor of a sales trader in the market making industry during 1999 and 2000."  *Id.* at 513.  Similarly here, the SEC's complete failure to adduce evidence sufficient to establish the relevant standard of care precludes any finding of severe recklessness on Shanahan, Jr.'s part.

Even if the SEC were to argue that the testimony of General Lewi could establish a standard of care applicable to outside directors, such a claim would get the SEC nowhere.  In the first place, the testimony of a lone outside director with a military background is insufficient to demonstrate an *objective* standard of care.[29]  Such an inquiry would effectively boil down to

---

[29] For obvious reasons, the testimony of management and board *insiders* Shanahan, Sr. and Gerald Daniels are irrelevant to what a reasonably prudent outside director would have known and acted in like circumstance – particularly given the fact that Daniels joined ESSI in April 2003, outside the time frame of the events alleged in the Complaint.

whether Shanahan, Jr. acted with more or less care than General Lewi. Second, this comparison can only show that General Lewi – like Shanahan, Jr. – had no knowledge of any backdating improprieties, and similarly relied on ESSI's management, in addition to accounting and legal professionals both inside and outside of ESSI, to ensure that ESSI's securities filings were accurate. In short, there was no evidence presented at trial that Shanahan, Jr. failed to comply with the standard of care applicable to an outside director.

General Lewi, like Shanahan, Jr., testified that he did not believe the Compensation Committee was responsible for pricing options, and that that function was performed by management. See Lewi Trial Depo. (Jan. 29, 2009) at 140:23-141:05; Trial Tr., Vol. 6-B at 128:15-129:3. Like Shanahan, Jr., General Lewi testified that he never had reason to suspect that pricing was not being handled properly and always believed it was being done "smoothly and properly." Lewi Trial Depo. at 141:12-13; Trial Tr., Vol. 6-B at 129:19-130:4. As with Shanahan, Jr., General Lewi testified that he had no idea during the relevant time period what the rules were that governed the granting of options – and still is somewhat unclear. Trial Tr., Vol. 7-B at 57:13-22. But both trusted that Landmann and others were performing their jobs properly. Shanahan, Jr. testified that Landmann was the "go-to guy" for accounting questions, and believed that either Landmann or Gerhardt were handling the pricing of options. Trial Tr., Vol. 7-A at 115:16-25. General Lewi similarly considered Landmann to be the "company's knowledge" about stock options, and thought that he was doing "an outstanding job." Lewi Trial Depo. at 154:24-155:22. Therefore, it should come as no surprise that General Lewi, like Shanahan, Jr., testified that he was completely unaware of any backdating at ESSI until the *St. Louis Post-Dispatch* article in May 2006, which was also the first time that he had heard of backdating. Lewi Trial Depo. at 125:20-126:11.

Nor did the evidence at trial indicate that Shanahan, Jr.'s review of public filings was anything other than appropriate. With respect to proxy statements, for example, the undisputed evidence at trial was that Landmann was the primary point person for drafting and finalizing the

20

proxy statements, a role he took over from David Mattern during the relevant time period.[30] Landmann also drafted the specific portion of the proxy statement constituting the Report of the Compensation Committee.[31]  Landmann's testimony was that he used the Option Pricing Sentence in initial drafts and simply "left the language in there" over the years.  Trial Tr., Vol. 3-B at 57:16-58:3.[32]  In virtually the same breath, Landmann admitted that he did *not* elevate his concerns over the inaccuracy of the Option Pricing Sentence to the board of directors, including Shanahan, Jr.  *Id.* at 58:4-59:5.  Instead, he testified that it was his practice to wait until he "had a clean enough draft" to send the draft proxy statements to the board of directors.  *Id.* at 48:6-17. He testified that he occasionally received changes and comments from Shanahan, Jr. with respect to the proxy statements, *id.* at 63:9-17, just as he did from other board members, *id.* at 48:18-49:2.

Shanahan, Jr. testified that he reviewed the proxy statements and other securities filings at ESSI.  See Trial Tr., Vol. 6-B at 70:3-12; Trial Tr., Vol. 7-B at 12:5-6 ("Q: You read the proxies though, right?  A.  Right.").  For his part, General Lewi testified that he would look at proxy statements "pretty quickly."  Lewi Trial Depo. at 174:25.  Shanahan, Jr. testified that in addition to reviewing the proxy statements, he also relied on the many people involving in the drafting and review process, particularly the Finance Department, to ensure that they were accurate.  See Trial Tr., Vol. 6-B at 77:21-24; Trial Tr., Vol. 7-B at 98:23-100:5.  Nobody ever alerted him that anything was being done improperly.  Trial Tr., Vol. 7-B at 98:23-100:5.  See *Pasternak*, 561 F. Supp. 2d at 513-14 (observing that the SEC failed to present any evidence

---

[30] Trial Tr., Vol. 3-B at 45:7-46:12, 54:19-24, 61:20-62:6, 71:16-23.

[31] Trial Tr., Vol. 5-A at 124:5-13 ("I drafted the report of the compensation committee as with, as I had indicated before, the rest of the proxy.  I – for a period – a period of time I took responsibility for the first draft and then sought out information regarding items I didn't know about, the number of times the compensation committee met, maybe who exactly was on it as of the end of the year, had there been any changes or whatever, and any other information in here that – that I just did not have.").

[32] Similarly, Landmann testified that he was the one who drafted the ESSI stock option plans under the supervision of ESSI's general counsel, Dave Mattern and perhaps outside counsel. Trial Tr., Vol. 2-B at 61:23-63:10.  With respect to the Option Pricing Sentence in the plans, Landmann's testimony was that the particular language was simply grandfathered in from previous versions of the plan which had been the province of ESSI's various in-house lawyers.

tending to show a deviation from the standard of care where "it is apparent that Pasternak took all necessary steps to ensure compliance with federal securities law. He aptly relied on his compliance and legal departments and supported any changes management at Knight felt would prevent a compliance issue"); see also id. at 512 ("Pasternak had numerous obligations as CEO and Chairman of the Board of Directors that kept him from knowing every movement within Knight."). In short, there is no evidence that Shanahan, Jr. acted otherwise than the reasonably prudent outside director in like circumstances would do with respect to review of ESSI's public filings. And, importantly, had anyone studied the different filings and thoroughly read the Option Pricing Sentence, as discussed above, they would not know whether retrospective pricing was permitted or not.

**B.      Shanahan, Jr. Is Entitled to Judgment as a Matter of Law on Any Claims Predicated on Theories of Negligence.**

Belatedly, the SEC has asserted that it need only prove negligence in order for Shanahan, Jr. to be liable under Counts 1 and 3. Because the SEC may not proceed on theories of negligence under the circumstances of this case, the Court should grant judgment as a matter of law to Shanahan, Jr. on these claims.

**1.      The SEC Has Disclaimed Reliance on Theories of Negligence.**

As Shanahan, Jr. has previously argued in his proposed jury instructions and trial brief, the SEC may not proceed on theories of negligence in this case. To begin with, the portion of the Complaint that sets forth the factual predicate of allegations against Shanahan, Jr. is rife with allegations that Shanahan, Jr. "knew, or was reckless in not knowing," of backdating. See Compl. ¶¶ 9, 24, 38, 40, 43, 45, 46. Nowhere in the factual statement does the SEC allege negligent conduct. Indeed, with respect to the signing and approval of Forms 10-K, proxy statements, and Forms S-8, the SEC alleges specifically that Shanahan, Jr. "knew, or was reckless in not knowing," that representations in such statements were false. See id. at ¶¶ 38, 40 (proxy statements), 43 (Forms 10-K), 45 (Forms S-8).

Furthermore, to the extent that the Complaint includes boilerplate recitations of

---

Trial Tr., Vol. 5-A at 177:9-178:8.

"negligence" in its "Claims for Relief" section with respect to Counts 1 and 3, the SEC has disclaimed reliance on negligence theories. Early on, when Shanahan, Jr. moved to dismiss the complaint for failing to allege adequately the who, what, when, and where, the SEC responded that it had alleged that Shanahan, Jr. acted "knowingly or recklessly." Plaintiff's Response to Motion to Dismiss at 5, 6, Docket No. 43 (Sept. 26, 2008) (alleging that Shanahan, Jr. "either knew, or was reckless in not knowing"); *id.* at 10 (alleging that Shanahan, Jr. "knowingly or recklessly approved and/or signed publicly filed proxy statements, Forms 10k and S-8").

Similarly, during the course of discovery, the SEC limited the factual predicate for its claims to theories of intentional misconduct and recklessness. See Plaintiff's Response to Shanahan Jr.'s First Set of Interrogatories at 14-15 (Interrogatory #7) (April 20, 2009) (attached as Ex. 2 to the Declaration of Jennifer Huber in Support of Shanahan, Jr.'s Proposed Jury Instructions, Docket No. 171 (Jan. 12, 2010)) (stating that "[i]n order to prevail on its claims, the Commission need only prove that Shanahan Jr. acted recklessly during his participation in the issuance of a single, backdated option grant, and in the Compensation Committee's recordkeeping practices," and alleging that Shanahan Jr. "knew, or was reckless in not knowing, that the stock options he received dated December 2, 1996, February 1, 1998, July 1, 1999, and March 29, 2001 actually were not granted until after those dates"); *id.* at 19-20 (Interrogatory #11) (claiming to have "contemporaneous documentary evidence, including but not limited to ESSI's proxy statements, and the Company's Forms 10-K and S-8, demonstrating that Shanahan Jr. knew, or was reckless in not knowing, that ESSI's option grants were required to reflect the fair market value of the stock on the date the options were awarded," that "Shanahan Jr. knew, or was reckless in not knowing, that ESSI was making public disclosures that the Company adhered to these requirements in making prior option grants," and "recommended or approved the issuance of in-the-money stock options to his father and other company executives which he knew, or was reckless in not knowing, were priced lower than the stock price on the date the options were awarded").

Four months later, on the very last day of the discovery period – August 31, 2009 – the SEC included negligence language in qualifying its admissions to Shanahan, Jr.'s second set of

23

requests for admission. The SEC may not expand the scope of its theories of liability in an effort to salvage its case through this last-minute reversion to boilerplate. Cf. Memorandum and Order at 9 n.7, Docket No. 160 (Jan. 12, 2010) (granting summary judgment to Shanahan, Jr. on Claim 7) ("To the extent the SEC attempts to shift the factual predicate of Count VII in its response to Shanahan Jr.'s Motion for Summary Judgment, the Court will not consider such new assertions here."). Indeed, even the SEC's trial brief recognizes that the SEC's claim have always been based on allegations of fraud: "[T]his case is about Shanahan Jr.'s knowledge of the *deliberate or reckless* circumvention of ESSI's shareholder-approved stock option plans and the method of pricing stock option awards described therein." See Plaintiff's Trial Brief at 2, Docket No. 170 (Jan. 12, 2010); see also id. (asserting that evidence at trial will demonstrate Shanahan, Jr.'s "knowledge that options were being backdated to correspond with low points in the company's stock price, and his intentionally or recklessly false statements regarding ESSI's stock option awards contained in the company's public filings").

2.    **The Eighth Circuit Has Not Directly Ruled on the Applicable Standard of Liability for Claims Under 17(a)(2) and (3) and Section 14(a).**

Even if the Court finds that the SEC may proceed on theories of negligence in this case, it is not clear that simple negligence is the proper standard to apply to outside directors. Although the law is well-established that scienter is required for Section 17(a)(1), Aaron v. SEC, 446 U.S. 680, 701-02 (1980), *Aaron* does not expressly hold that *negligence* – rather than some other, non-scienter mental state – is the proper standard. Compare id. at 702 ("We further hold that the Commission need not establish scienter as an element of an action to enjoin violations of § 17(a)(2) and § 17(a)(3) of the 1993 Act."). Though the Eighth Circuit observed that the SEC "need only prove negligence in actions under sections 17(a)(2) or (3)" in *Pagel, Inc. v. SEC*, 803 F.2d 942, 946 (8th Cir. 1986), the question of negligence was not squarely presented in the facts of that case; rather, to affirm, the Eighth Circuit found that there was substantial evidence of scienter and intentional conduct on the part of the broker-dealer defendants.[33] The defense is not

---

[33] See id. ("We believe the Commission could reasonably have inferred from the evidence of price movement, trading activity, and other factors that the manipulation was undertaken for the

aware of any case in the Eighth Circuit that considered the requisite mental state in the context of an outside director's review of public filings.

In addition, the Supreme Court has expressly reserved ruling on whether scienter is a required element under Section 14(a).  See *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 n.5 (1991). And as the SEC has repeatedly recognized, neither has the Eighth Circuit ruled directly on whether scienter is a required element for this claim.[34]  It goes without saying that the Eighth Circuit has not squarely addressed the proper standard of liability for non-management, outside directors.  Indeed, the Sixth Circuit has held that another group of corporate "outsiders" – outside accountants – may not be held liable for proxy fraud absent a showing of scienter.  See *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 428-29 (6th Cir. 1980).

Given the potentially broad-ranging consequences of imposing Section 17(a) and proxy fraud liability on outside directors based on their review of periodic public filings, the Court should not lightly presume that mere negligence would be the appropriate standard of liability.

**3.    The SEC Has Failed to Present Evidence of the Relevant Standard of Care.**

Even if the Court finds that the SEC may proceed on theories of negligence under Section 17(a)(2) and (3), Section 14(a), and Rule 14a-9, the SEC has failed to adduce evidence sufficient to establish the standard of care or to support a finding of negligence.

As with a theory of severe recklessness, the SEC may not simply assert that Shanahan, Jr. violated the standard of care and acted negligently.  Rather, the SEC must adduce evidence that both (1) establishes the standard of care and (2) demonstrates that Shanahan, Jr. breached that standard.  See  *In re King Pharms., Inc.*, No. 2:03-CV-77, 2004 U.S. Dist. LEXIS 30210, at *13-14 (E.D. Tenn. July 12, 2004) (noting, in case alleging violations of Section 14(a) and Rule 14a-

---

purpose of securing financial and tax benefits for petitioners and thus was intentional.").

[34] See Plaintiff's Memorandum of Law in Support of Its Motion for Summary Judgment Against Michael F. Shanahan, Sr. at 17, Docket No. 104 (Oct. 7, 2009) (recognizing a circuit split and the absence of binding authority); Plaintiff's Trial Brief at 21, Docket No. 170 (Jan. 12, 2010) ("There has been a split among the circuit courts on the question of whether scienter is a required element of claims under Rule 14a-9.  The Eighth Circuit has not directly ruled on this point …").

9 for negligently including false information in soliciting proxies, that "[o]bviously, liability under this count will require proof of negligence, i.e., proof of the standard of care, proof of a duty owed, and proof that such duty was breached"). As already discussed in Section IV.A.3, *supra*, there has been a complete failure of proof as to either. Accordingly, the Court should grant judgment as a matter of law on both of these claims.

**C.    Shanahan, Jr. Is Entitled to Judgment as a Matter of Law on the Claim of Aiding and Abetting the Filing of Materially False Annual Reports.**

In order to prevail on Count 6, the SEC must prove that ESSI committed a primary violation of the securities laws by making a materially false statement in its Form 10-K filings by virtue of the Option Pricing Sentence; that Shanahan, Jr. had actual knowledge of the wrongfulness of the primary violation; and that Shanahan, Jr. knowingly and substantially assisted in the primary violation. See *Camp v. Dema*, 948 F.2d 455, 459-60 (8th Cir. 1991). Even assuming a primary violation by ESSI, the SEC has failed to present evidence sufficient to find either of the remaining two elements.

**1.    The Evidence Is Insufficient to Establish the Requisite State of Mind.**

As Shanahan, Jr. has previously argued in his dispositive briefing, see Reply in Support of Shanahan, Jr.'s Motion for Summary Judgment at 11-12 & nn.30, 31, Docket No. 135-2 (Nov. 13, 2009), under Section 20(e) of the Private Securities Litigation Reform Act, severe recklessness is no longer sufficient to prove aiding and abetting liability in an SEC enforcement action; rather, the SEC must show actual knowledge. See *Pasternak*, 561 F. Supp. 2d at 501 ("Many of the cases which held that recklessness was sufficient to establish knowledge involved causes of action for aiding and abetting violations of Exchange Act Section 10(b) brought by private parties, not by the SEC via Section 20(e); importantly, those cases pre-dated *Central Bank* and the PSLRA."). Indeed, the SEC is precluded from arguing otherwise by virtue of its own allegations of "knowing" conduct. See Compl. at ¶ 70. Because the SEC has failed to present evidence sufficient to support a finding of actual knowledge of wrongdoing for the

468343.01

reasons discussed above, the SEC's claim of aiding and abetting fails as a matter of law.[35]  See
*Pasternak*, 561 F. Supp. 2d at 514 (finding no evidence of actual knowledge where "the evidence
suggests that Defendants' knowledge supported the belief that Joseph provided best execution,
that Joseph's customers were satisfied with his trading, that Joseph was not the only sales trader
to earn higher-than-average sales credits, and that Knight's compliance and legal department
were fully capable of and efficient at reviewing trades for any violation of a securities law or
regulatory rule or regulation.  Moreover, Defendants' knowledge of Joseph's profits or sales
credits could not have raised a 'red flag' that Joseph earned those profits or sales credits through
improper means").

2. **The SEC Has Presented No Evidence Sufficient to Constitute "Knowing and Substantial Assistance" of a Primary Violation.**

In addition, the SEC failed to present evidence sufficient to establish knowing and
substantial assistance by Shanahan, Jr.  Aiding and abetting requires that "[t]he assistance must
be such that it is a *substantial factor in causing* the resulting violation."  *Camp*, 948 F.2d at 460
(emphasis added, internal quotation marks and citation omitted).  Put differently, it must be
shown "that the defendant's substantial assistance *proximately caused* the primary violation."
*Pasternak*, 561 F. Supp. 2d at 502 (emphasis added).  And as the Court recognized in its
summary judgment order, a defendant "whose actions are routine and part of normal everyday
business practices would need a higher degree of knowledge for liability as an aider and abettor
to attach."  Memorandum and Order at 7, Docket No. 160 (quoting *Camp*, 948 F.2d at 459).

In *SEC v. Cedric Kushner Promotions, Inc.*, for example, the defendant Angel was one of
three directors of a public company who was alleged to have aided and abetted the company's
violation of Section 10(b) and Rule 10b-5 for filing false and materially misleading SEC filings.
417 F. Supp. 2d 326, 327 (S.D.N.Y. 2006).  At the time of the events in question, the 25-year-old
Angel undisputedly had some connection to the preparation of the forms in question; he gathered
backup documentation for the company's accountants and outside auditors, answered questions

---

[35] Indeed, even a theory of severe recklessness would be unavailing.  See Sections IV.A.2 and
IV.A.3, *supra*.

about subsequent events and pending litigation against the company, and reviewed those portions of drafts which related to his open items.  Indeed, as the SEC pointed out, one of Angel's duties was "compliance and SEC filings" and was "in constant email and telephone communication" with the auditors.  See *id.* at 335.  Nonetheless, the court found that this "very limited," "very background role" was insufficient to support a finding of substantial assistance.  In granting summary judgment for Angel, the court pointed out that he was "not involved in preparing or reviewing the financial or accounting statements that contained the alleged misstatements or omissions," id. at 336; specifically, he had no hand in the preparation or review of "any of the subjects – cash flow, etc. – which turned out to be falsely presented."  *Id.* at 335.

Similarly here, there was no evidence at trial that Shanahan, Jr. did anything out of the ordinary with respect to the filing of ESSI's Forms 10-K; he testified unequivocally that he duly reviewed the forms and permitted his electronic signature to be placed on them.  Indeed, the evidence at trial clearly illustrated the very limited and background role that Shanahan, Jr. and other outside directors played.  Landmann testified that he was primarily responsible for coordinating the preparation of the Form 10-K filings with the assistance of other persons in the Accounting or Finance Department, senior management, and board members, which PricewaterhouseCoopers would then review.  Trial Tr., Vol. 3-B at 74:4-17, 76:15-17.  Landmann testified that he sent copies of the Forms 10-K to the board members for their review, but admitted that "in most instances," he failed to send the financial statements as well.  Trial Tr., Vol. 5-B at 9:8-9 ("A.  Yeah.  I believe in most instances I sent out just a version of the 10-K absent the financial statements."); *id.* at 10:16-20 ("Q. … So do I have this right, sir?  You sent to the Directors on January 29, 2001, a copy of the company's Form 10-K with no attached financial statements?  Is that right?  A.  It appears so.").  It was in these financial statements that the footnote containing the Option Pricing Sentence would have appeared.  See *id.* at 15:23-16:8 ("Q. Those are footnotes in the financial statements that weren't in the copies that got sent to the Directors, right?  A.  With this package, correct.  Q.  But that was your standard practice was – I asked you and you told me that was standard practice was not to include the financial statements in the package for signature.  A.  I said I believed I did that most of the time.").  Indeed, with

28

respect to the 2001 Form 10-K, Landmann admitted that he circulated copies of the Form 10-K with no attached financial statements to the board of directors *on the same day* that the Form 10-K was filed.  See Trial Tr., Vol. 5-B, 11:16-23.  When asked why he did not send financial statements as a matter of practice to all of the directors, Landmann testified that the Audit Committee had already had the opportunity to review the financial statements, together with Pricewaterhouse Coopers.  Trial Tr., Vol. 5-B at 17:5-18:13.

What Landmann's undisputed testimony about the way Forms 10-K were prepared and filed at ESSI clearly illustrates is that it was not the function of the entire board, let alone its outside directors, to parse the accounting in the financial statements prior to the filing of the Form 10-K.  Indeed, on direct examination, the SEC elicited testimony from Landmann establishing that he needed only a majority of the signatures from the Board of Directors, in addition to several officers' signatures, in order to file a Form 10-K.  See Trial Tr., Vol. 3-B at 48:15-49:2; see also General Instructions to Form 10-K, Part D (providing that a majority of the board of directors and certain other officers must sign the Form 10-K).  It cannot be said, therefore, that Shanahan, Jr.'s routine act of reviewing and approving the Form 10-K was a substantial factor, or proximately caused, any primary violation by ESSI.

**D.    The SEC Should Be Precluded from Relying on Newly-Asserted Theories**

The SEC should not be permitted, in opposing this motion, to shift to new theories of liability that have not been fairly asserted or charged.  For example, the SEC may seek to claim (improperly) that options repricing, standing alone, was somehow wrongful.  In fact, allegations of repricing were levied in the Complaint against Shanahan, Sr. only, and concerned only the September 4, 1998 and July 1, 1999 option grants; these are not accusations that have ever been raised against Shanahan Jr., the only defendant here.  See Compl. ¶¶ 31-33, 41.  Moreover, the SEC failed to adduce any evidence of Shanahan, Jr's involvement in such grants.  Further, there was no evidence at trial that repricing was ever done in a year when it was prohibited by the stock option plan; and when repricing occurred, its occurrence  was properly disclosed in securities filings.  In any event, the mentions of repricing in connection with backdating were put in the text of stock option award letters and were fully disclosed to PriceWaterhouse Coopers –

negating any suggestion of scienter – making it doubly improper to claim that this evidence is relevant to any issue in the case.[36]

From Day 1, this has been a securities fraud case about options backdating. The SEC should not be permitted to manufacture entirely different theories of liability simply because it lacks evidence sufficient to send this case to the jury.

## V.    Conclusion

For the foregoing reasons, Shanahan, Jr. respectfully requests that the Court grant his Motion for Judgment as a Matter of Law.

---

[36] Some of the evidence at trial also related to the question whether certain directors received unauthorized options under the Non-employee Director Plan, an allegation levied against Shanahan, Sr. only, Compl. ¶¶ 6, 3, and thus an issue relevant only to the question of remedies, if any. See Memorandum and Order at 2 n.3, Docket No. 160 (Jan. 12, 2010) ("With respect to Shanahan Jr.'s involvement with the Non-employee Director Plan, the Commission alleges only that he received profits of $379,738 from his receipt of unauthorized options. (Compl., ¶ 8).").

30

Respectfully submitted,

Dated:  February 11, 2010

MICHAEL F. SHANAHAN, JR.


BY:____/s/ James Martin_____
         James Martin  (#11651)
         ARMSTRONG TEASDALE LLP
         One Metropolitan Square, Suite 2600
         St. Louis, Missouri 63102
         (314) 621-5070
         (314) 552-4874 (facsimile)
         jmartin@armstrongteasdale.com

         Stuart L. Gasner
         Jennifer A. Huber
         KEKER & VAN NEST LLP
         710 Sansome Street
         San Francisco, California 94111-1704
         (415) 391-5400
         (415) 397-7188 (facsimile)
         sgasner@kvn.com
         jhuber@kvn.com


         *Attorneys for Defendant*
         *Michael F. Shanahan, Jr.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of February, 2010, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

**For Plaintiff SEC**

Robert M. Moye
Jeffrey A. Shank
SECURITIES AND EXCHANGE COMMISSION
175 W. Jackson, Suite 900
Chicago, IL 60604
Email: MoyeR@sec.gov
Email: shankj@sec.gov



*/s/ James Martin* _____

468343.01